# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JOEL MOUNTS,  
     Plaintiff,

vs.

COMMISSIONER OF  
SOCIAL SECURITY,  
     Defendant.

Case No. 1:19-cv-1033  
Litkovitz, M.J.

**ORDER**

Plaintiff Joel Mounts brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying his application for disability insurance benefits ("DIB"). This matter is before the Court on plaintiff's Statement of Errors (Doc. 12), the Commissioner's response in opposition (Doc. 17), and plaintiff's reply (Doc. 18).

## I. Procedural Background

Plaintiff filed his application for DIB in June 2016, alleging disability since July 27, 2011, due to major depressive disorder, severe acute anxiety, insomnia, stress, and crushed upper head of tibia and broken fibula. (Tr. 263). The application was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge (ALJ) William Diggs on September 12, 2018. Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing. On December 4, 2018, the ALJ issued a decision denying plaintiff's DIB application. This decision became the final decision of the Commissioner when the Appeals Council denied review on October 25, 2019.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

**B. The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] last met the insured status requirements of the Social Security Act on March 31, 2018.
>
> 2. The [plaintiff] did not engage in substantial gainful activity during the period from his alleged onset date of July 27, 2011 through his date last insured of March 31, 2018 (20 CFR 404.1571 *et seq.*).
>
> 3. Through the date last insured, the [plaintiff] had the following severe impairments: fracture of lower limb, affective disorder, and anxiety (20 CFR 404.1520(c)).
>
> 4. Through the date last insured, the [plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that, through the date last insured, the [plaintiff] had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he is further limited to frequently balancing, stooping, kneeling, crouching, crawling, or climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; avoiding all work hazards (dangerous machinery, unprotected heights); performing simple, routine tasks in an environment with no fast paced or strict production demands; occasionally interacting with supervisors or co-workers; never interacting with

3

the public; and working in a setting with only occasional changes explained in advance.

6. Through the date last insured, the [plaintiff] was unable to perform any past relevant work (20 CFR 404.1565).[1]

7. The [plaintiff] was born [in] . . . 1965 and was 52 years old, which is defined as a younger individual age 18-49 (sic), on the date last insured. The [plaintiff] subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8. The [plaintiff] has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed (20 CFR 404.1569 and 404.1569a).[2]

11. The [plaintiff] was not under a disability, as defined in the Social Security Act, at any time from July 27, 2011, the alleged onset date, through March 31, 2018, the date last insured (20 CFR 404.1520(g)).

(Tr. 53-62).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

---

[1] Plaintiff's past relevant work was as a material handler/forklift driver, a heavy, semi-skilled position. (Tr. 60, 110).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative medium, unskilled occupations such as laundry worker (150,000 jobs in the national economy) and packer (480,000 jobs in the national economy). (Tr. 61, 111-12).

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation omitted). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the Social Security Administration (SSA) fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

D.       **Relevant Medical Evidence and Opinions**

*1.  Dr. William Sawyer, M.D.*

Plaintiff treated with Dr. Sawyer, a primary care physician, from May 2001 through

2016.  (Tr. 448-92, 505-26, 581-612).  Dr. Sawyer discussed plaintiff's issues with him and

prescribed medication, including Xanax (*Id.*), and he treated plaintiff for hypogonadism.  (*See*

Tr. 393).  In July 2016, Dr. Sawyer completed a questionnaire on behalf of the state agency.  (Tr.

486-90).  Dr. Sawyer diagnosed plaintiff with severe depression, severe anxiety, social phobia,

and personality disorder.  (Tr. 487, 490).  Dr. Sawyer reported that plaintiff had suffered from

anxiety and depression over the past 15 years, which had worsened during the past five years

after plaintiff was fired from his job in July 2011.  (Tr. 487).  Dr. Sawyer reported that plaintiff

was under a lot of pressure at work and he had not "functioned well" since losing his job.  Dr.

Sawyer opined that plaintiff's symptoms were consistent with severe anxiety and depression and

borderline personality disorder.  Dr. Sawyer reported that antidepressants caused too many side

effects; Xanax helped plaintiff to remain calm but did not "prevent instability if challenged by

coworkers or others"; and "nothing helped his social phobia and compatibility with others."  (Tr.

487-88).  Dr. Sawyer opined that plaintiff "feels hopeless and helpless about his future."  (Tr.

488).  Dr. Sawyer noted plaintiff has a mild physical limitation of the right leg, but most of his

limitations "are psychological."  (*Id.*).  Dr. Sawyer described plaintiff's mental status

abnormalities as "severe anxiety and depression," "difficulty working with others," and

"difficulty concentrating and following through on tasks"; he had "been depressed" and had

suffered "severe anxiety for decades" due to "frustration and difficulty concentrating"; his social

phobia and personality disorder preclude him from working with others because if "challenged by coworkers he has difficulty controlling his reaction"; he showed a lack of interest in activities he used to enjoy and did not have the same attention to hygiene that he used to have; and he has a "very volatile personality" and "reacts to certain environments unless medicated." (Tr. 489). Dr. Sawyer found that plaintiff had several "stress issues with family members that has (sic) exacerbated his condition of anxiety and getting along with others." (*Id.*). Dr. Sawyer opined that plaintiff's symptoms had persisted since Dr. Sawyer began treating him in May 2001. (Tr. 490).

In July 2016, plaintiff was seen for anxiety and depression. (Tr. 511). Plaintiff was "having more difficulty sleeping and concentrating." Though Xanax helped to keep him calm, he was "very reactive and volatile and feeling hopeless." His financial situation was "extremely difficult" and "a near disaster." He could not "get in or fit in with others." He "had this for decades since 2001," the period during which Dr. Sawyer had treated plaintiff. He had struggled with fitting in with "a work crowd" at his last job, which he lost in 2011. He was "trying to be supportive of his wife" but was unable to "complete tasks very well" at that time. He had taken some "manic depressive medications in the past," but they caused side effects and did not help his symptoms. He felt that testosterone medications had helped "invigorate him" and he "felt positive at times" after they were initially prescribed, but he felt they were no longer having that effect on him. (*Id.*). Dr. Sawyer diagnosed plaintiff with severe anxiety, severe depression, and borderline personality disorder and social phobia. The plan was to continue the present treatment and "[l]ook for some hopefulness" in the hope life would improve. (*Id.*).

Plaintiff was seen for follow-up of anxiety and severe depression in August 2016. (Tr. 509). Dr. Sawyer planned to write a note to excuse plaintiff from jury duty "due to his severe anxiety and social phobia." (*Id.*). In September 2016, plaintiff was "really angry and upset" that he had been turned down for disability benefits. (Tr. 507). Plaintiff reported: "He can hardly sleep and cannot believe it. He cannot get a job gainfully working with anybody. He has been looking around and having a hard time." Dr. Sawyer and plaintiff "talked at great length about issues." (*Id.*). Dr. Sawyer diagnosed plaintiff with severe anxiety and depression, and he noted plaintiff was feeling hopeless. (*Id.*).

In October 2016, plaintiff reported feeling a little depressed. (Tr. 505). He had not tolerated antidepressants that had been prescribed and did not want to take them. Dr. Sawyer encouraged plaintiff to take antidepressants since he was taking only Xanax at that time. (*Id.*).

Dr. Sawyer completed three "Listings Questionnaire (Mental)" in October 2016 and opined that plaintiff met three listings in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1: Listing 12.04 for Affective Disorders (Tr. 513-15); Listing 12.06 for Anxiety-Related Disorders (Tr. 516-18); and Listing 12.08 for Personality Disorders (Tr. 519-20).[3] Dr. Sawyer first found that plaintiff satisfied the requirements of Listing 12.04 - Affective Disorders, because he suffered from a "[m]edically documented persistence, either continuous or intermittent, of . . . [d]epressive syndrome" characterized by "[a]nhedonia or pervasive loss of interest in almost all activities"; "[s]leep disturbance"; "[f]eelings of guilt or worthlessness"; and "[t]houghts of suicide." (Tr. 514). Dr. Sawyer also indicated that plaintiff experienced "[e]asy

---

[3] A duplicate copy of the completed questionnaires is included in the record at Tr. 786-93.

distractibility." (Tr. 515). Dr. Sawyer opined that plaintiff had "[m]arked difficulties in maintaining social functioning" and "[m]arked difficulties in maintaining concentration, persistence, or pace." (*Id*.).

Dr. Sawyer also found that plaintiff met Listing 12.06 - Anxiety Related Disorders. (Tr. 516-18). Dr. Sawyer opined that plaintiff suffered from "[g]eneralized persistent anxiety" with "[a] persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation," which Dr. Sawyer characterized as a "social phobia"; "[r]ecurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week," but which Dr. Sawyer indicated plaintiff was being medicated for; and "[r]ecurrent obsessions or compulsions which are a source of marked distress," which Dr. Sawyer also characterized as a "social phobia." (Tr. 517). Dr. Sawyer opined that plaintiff's symptoms resulted in "[m]arked difficulties in maintaining social functioning and [m]arked difficulties in maintaining concentration, persistence, or pace. . . ." (Tr. 517-18).

Finally, Dr. Sawyer opined that plaintiff met Listing 12.08 - Personality Disorders. (Tr. 519-20). Dr. Sawyer opined that plaintiff had "[d]eeply ingrained, maladaptive patterns of behavior associated with" symptoms of "[s]eclusiveness or autistic thinking" and "[p]ersistent disturbances of mood or affect," which he categorized as depression. (Tr. 520). Dr. Sawyer opined that these symptoms result in "[m]arked difficulties in maintaining social functioning" and "[m]arked difficulties in maintaining concentration, persistence, or pace. . . ." (Tr. 520).

9

In November 2016, plaintiff reported that he was having "a hard time sleeping and concentrating" and he was "worse now." (Tr. 524). He was on a "downward spiral." His concentration was "much worse." Dr. Sawyer reported that plaintiff was "a little irritable and tremulous." He was becoming "much more secluded and a little bit irrational at times." Dr. Sawyer also wrote:

> He knows he has an upper respiratory infection. He was taking care of the grandbaby. It is quite a responsibility. His wife is now going through it as well. It is dragging her down because of what is going on with the children. He is tired.

(*Id*.). Dr. Sawyer diagnosed plaintiff with an acute upper respiratory infection, anxiety, fatigue, depression, insomnia, hypertension, and social phobia. (*Id*.).

### 2. Dr. Christopher Lawley, M.D.

Plaintiff began treating with Dr. Lawley, a urologist, in November 2011. (*Se*e Tr. 426). Dr. Lawley's test results note low testosterone levels dating back to 2012. (Tr. 442). Dr. Lawley diagnosed plaintiff with hypogonadism and treated him with testosterone, which was adjusted as needed based on laboratory results.[4] (Tr. 351-392, 394-424, 426-47, 546-580, 736-772). Dr. Lawley wrote in a letter dated December 6, 2017, that plaintiff suffered from "low testosterone due to hypogonadism," which Dr. Lawley attributed to a pituitary injury that plaintiff had sustained many years prior. (Tr. 714). Dr. Lawley opined that plaintiff would need to maintain "his testosterone supplementation." (*Id*.).

---

[4] "Hypogonadism is a medical term for decreased functional activity of the gonads. . . . Male hypogonadism is characterized by a deficiency in testosterone – a critical hormone for sexual, cognitive, and body function and development." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3255409/ (last accessed March 25, 2021). "An abnormality in the pituitary gland can impair the release of hormones from the pituitary gland to the testicles, affecting normal testosterone production." *Id*.

### 3. *Dr. Harold T. Pretorius, M.D.*

Dr. Lawley referred plaintiff to Dr. Pretorius, a neuroendocrinologist[5], for evaluation of a possible pituitary abnormality in May of 2017. (Tr. 615; *see* Tr. 712). Dr. Pretorius diagnosed a disorder of the pituitary gland and associated growth hormone deficiency and testosterone insufficiency. (Tr. 527-28, 530-45, 613-711, 715-16). Dr. Pretorius found that at some point plaintiff had suffered a traumatic brain injury with associated short-term memory loss. (*Id.*).

In November 2017, Dr. Pretorius wrote a letter at counsel's request setting forth plaintiff's medical history, including his diagnosis and prognosis. (Tr. 712-13). Dr. Pretorius explained that Dr. Lawley had begun testosterone treatment for a testosterone deficiency and that other pituitary abnormalities that "would also compromise [plaintiff's] function" were suspected due to low levels of the pituitary hormones that would normally stimulate testosterone production. (Tr. 712; *see* Tr. 629-30). Dr. Pretorius reported that an endocrine evaluation showed that plaintiff had a growth hormone deficiency, "which also comes from the pituitary," and plaintiff had been started on growth hormone treatment to address the deficiency. (Tr. 712). Dr. Pretorius explained that the treatment can "help improve decreased mental function, such as memory loss," and correct low muscle mass typical of individuals with growth hormone deficiencies. (*Id.*). Dr. Pretorius opined that although the growth hormone treatment had some positive effects, plaintiff "had little or no improvement in his memory." (*Id.*). Dr. Pretorius reported that plaintiff had a history of "multiple episodes of head trauma[,] including multiple

---

[5] "Neuroendocrinology" is "a branch of science dealing with neurosecretion ['the process of producing a secretion by nerve cells'] and the physiological interaction between the central nervous system and the endocrine system." https://www.merriam-webster.com/dictionary/neurosecretion#medicalDictionary (last accessed March 25, 2021).

concussions in his prior activities as a motorcross driver and a martial arts specialist," and he discussed the link between head injuries and "pituitary gland abnormalities such as insufficient stimulation of the testis and insufficient growth hormone production." (*Id*.). Dr. Pretorius reported that "while pituitary abnormalities are treatable, . . . brain injury itself, which can cause multiple other symptoms, is more difficult to treat." (*Id*.).

Dr Pretorius also reported that plaintiff achieved an abnormal score on the Montreal Cognitive Assessment (MoCA), a screening test designed to evaluate memory loss, which disclosed he has mild cognitive impairment and specifically "difficulties with memory, particularly short term memory." (*Id*.). Dr. Pretorius opined that plaintiff's short-term memory loss "makes it very difficult if not impossible to pursue gainful employment." (Tr. 713). He opined that plaintiff "would not be able to remember even simple instructions; [h]e would have great difficulty learning any new procedures, even relatively simple ones"; and "[h]e would forget the names of coworkers or clients involved in any business endeavor." (*Id*.).

In addition, Dr. Pretorius opined that plaintiff suffers from depression, which in Dr. Pretorius' experience with "hundreds of cases" of patients with chronic or repeated brain injuries was a common symptom among such patients. (*Id*.). Dr. Pretorius reported that plaintiff had been referred to psychiatric services, but he had been unable to obtain an appointment with a psychiatrist during the course of his treatment with Dr. Pretorius. (*Id*.). Dr. Pretorius opined that plaintiff suffered from physical symptoms of depression, including fatigue and anxiety, and his depression was resistant to medical treatment. (*Id*.). Dr. Pretorius also reported that a "functional brain scan," known as a "SPECT scan," showed that plaintiff had an injury to the

12

temporal lobe of his brain, which may cause a "tendency to unstable mood" and in particular

"rapid mood changes and impulsive behaviors. . . ." (*Id*.). Dr. Pretorius concluded:

> In summary, Mr. Mounts is in my opinion totally disabled and not capable of any
> gainful employment. As a prior martial arts specialist with suicidal ideation and
> liability (sic) of mood, he poses a risk to himself and potentially to others as well
> in almost all imaginable work environments. It is well known that protracted and
> uncertain disability evaluations can create stress for the patients. In Mr. Mounts
> [sic] case a high level of the stress hormone, cortisol, has been measured. . . ."

(*Id*.)

In August 2018, after plaintiff's date last insured had passed, Dr. Pretorius wrote a letter

at counsel's request providing an update of plaintiff's condition. (Tr. 773-75). Dr. Pretorius

noted that even though an MRI of plaintiff's brain taken in November 2017 was normal and

showed no pituitary adenoma (*see* Tr. 660), it was more likely that the abnormal pituitary

function had another cause. (Tr. 773). Dr. Pretorius opined that the cause could be multiple

episodes of head trauma, including a blow to the head with a shovel around age 11 and a

motorcycle accident at about age 45. (*Id*.). Dr. Pretorius opined that plaintiff has depression

because he does not engage in pleasurable activities frequently; his score on a Beck Depression

scale fell in the severely depressed range; and treatment with antidepressants prescribed by

plaintiff's prior physician, Dr. Sawyer, over the course of 20-plus years had not been effective,

which indicated that plaintiff likely had treatment resistant depression. (Tr 774). Dr. Pretorius

opined based on plaintiff's results on the MoCA test, which plaintiff had repeated on June 27,

2018 and had failed[6], that plaintiff had a "significant" short-term memory deficit and would be

---

[6] Dr. Pretorius reported that plaintiff was "incapable of remembering any of 5 items on the test." (Tr. 774).
Dr. Pretorius wrote that in his opinion, "[p]eople who cannot remember 5 items for several minutes are not . . .
employable." (Tr. 774).

"off task for much more than 15% of the time in any task oriented environment." (*Id*.). Dr. Pretorius opined that plaintiff "is disabled to the extent that he would likely miss 2 or more days of work" and would be off-task more than 15% of the workday. (*Id*.). Dr. Pretorius did not believe plaintiff was malingering. (Tr. 775). Dr. Pretorius reported that plaintiff was "fired from his prior job July 11, 2011 for inability to get along with other people and inability to perform, which in part would appear to have been due to problems similar to those described in [the] letter." (Tr. 774-75).

On August 31, 2018, Dr. Pretorius wrote a third letter at counsel's request reporting on the results of the MoCA screening test, which had been administered to plaintiff four times between November 2017 and August 2018. (Tr. 785). Dr. Pretorius opined that the scores were "quite consistent and correlate well with [plaintiff's] performance status of mild to moderate ongoing moderate cognitive impairment." (*Id*.). Dr. Pretorius opined that plaintiff would be off task about 50% of the time due to short-term memory loss. (*Id*.). Dr. Pretorius wrote: "There is a clear relationship between loss of short-term memory and abnormal perfusion and metabolism of the mesial temporal (also termed hippocampal) area of the brain, which was present in [plaintiff's] case." (*Id*.). Dr. Pretorius opined that "the abnormality in the hippocampus, particularly when present bilaterally, is the cause of [plaintiff's] short-term memory loss"; head trauma can cause mesial temporal abnormality; "the multiple episodes of head trauma that plaintiff experienced" are particularly pertinent in plaintiff's case; and repeated head trauma is also associated with cognitive dysfunction. (*Id*.).

14

### 4. Dr. Victor Angel, D.O.

Dr. Angel, a primary care physician in Dr. Pretorius' office, saw plaintiff ten times to establish primary care and prescribe and refill plaintiff's medications. (Tr. 717-23, 726-35). Dr. Angel listed plaintiff's diagnoses as TBI, major depression, insomnia, hypogonadism, growth hormone deficiency, and a disorder of the pituitary gland. (Tr. 717, 726, 727, 732). Neurological findings included severe depression, memory loss, social phobia, and insomnia. (*Id.*). Dr. Angel wrote in a letter opinion dated August 23, 2018, that he agreed with the results of a "CNS Vital" test[7] plaintiff had completed in August 2018, which showed that plaintiff had a "significant impairment with focus, attention and concentration."[8] (Tr. 782). Dr. Angel opined that "due to these impairments [plaintiff] cannot function productively in the workplace and he would be off task ninety percent of the time." (*Id.*).

### 5. Dr. William Vonderhaar, Ph.D.

Dr. Vonderhaar evaluated plaintiff for disability purposes in August 2016. (Tr. 493-99). Plaintiff reported that he was terminated from his job that he held for 25 years due to too many absences, which plaintiff attributed to instances of anxiety and depression that he was wrongfully denied time off for. (Tr. 493). Plaintiff had never been psychiatrically hospitalized and had never seen any mental health providers, but he reported that he was prescribed antidepressants

---

[7] "CNS Vital Signs (CNSVS) is a computerized neurocognitive test battery that was developed as a routine clinical screening instrument. It is comprised of seven tests: verbal and visual memory, finger tapping, symbol digit coding, the Stroop Test, a test of shifting attention and the continuous performance test." https://pubmed.ncbi.nlm.nih.gov/17014981/#:~:text=CNS%20Vital%20Signs%20(CNSVS)%20is,and%20the%20c ontinuous%20performance%20test (last accessed March 28, 2021).

[8] Dr. Pretorius found that plaintiff's CNS Vital Signs test results were invalid. (Tr. 785).

15

and anti-anxiety medication by his primary care physician, who had diagnosed him with depression and anxiety. (Tr. 494-96).

On mental status examination, Dr. Vonderhaar observed that plaintiff was "very tense and anxious." (Tr. 496). At times he seemed irritated. He was a reliable informant and his memory for short and long-term events therefore seemed to be adequate for most purposes of daily living and commensurate with his average intellectual abilities. (Tr. 496). Concentration, memory and attention seemed adequate, and there were no signs of distractibility of thought or behavior or of any impulsivity of behavior or thought. There were no signs of any formal thought disorder and no signs of any personality disorder or psychotic manifestations. (Tr. 496-97).

Dr. Vonderhaar assessed plaintiff with major depressive disorder, "recurrent with occasional episodes of angry outbursts toward others, feelings of worthlessness and insomnia and social isolation" and unspecified anxiety disorder. (Tr. 498-99). Dr. Vonderhaar specifically found that plaintiff would have outbursts of both a verbal and possibly physical nature towards close family. (Tr. 497). Plaintiff reported to Dr. Vonderhaar "that his sons are both addicts and he has had physical altercations with them." (*Id*.). Plaintiff reported he had "repeated 'anger outbursts'" that happened "at least several times per week" and that kept him from socializing or leaving his house much. (Tr. 497). Dr. Vonderhaar opined that plaintiff would have difficulty working effectively and efficiently or cooperatively with supervisors and coworkers "unless he was involved in an activity that he felt was conducive to his capability of working cooperatively with others." (Tr. 498). Dr. Vonderhaar felt that a "more complete

16

medical evaluation seems warranted" in this regard. (*Id*.). Dr. Vonderhaar found that plaintiff's "mental ability to understand and remember and follow instructions does not appear to be negatively influenced" as he could answer all questions, he did not "demonstrate with any gross deficits in memory or comprehension," and "it would seem that he would be able to understand and remember to follow simple instructions" not involving physical work activities. (*Id*.). Dr. Vonderhaar opined that plaintiff's ability to "maintain attention and concentration, persistence and pace to perform routine tasks may, at times, be negatively influenced by depressive feelings, thoughts and worry and concern about his current depression and anxiety related" to Dr. Sawyer's 2001 diagnosis, which was treated with medication prescribed by Dr. Sawyer. (*Id*.). Finally, Dr. Vonderhaar opined that plaintiff's ability to "withstand the stress and pressures associated with day-to-day work activity can be seen as being negatively influenced due to his medical problems, worry and concern over his uncertain medical future, and possible future physical limitations. (Tr. 498).

      *6. State agency psychologists: Kathleen Malloy, Ph.D. and Vicki Warren, Ph.D.*

Non-examining state agency psychologist Dr. Malloy reviewed the file in September 2016 and found that plaintiff had mild restrictions in his activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 127). Dr. Malloy found that plaintiff's ability to understand and remember detailed instructions was "[n]ot significantly limited" because plaintiff did not demonstrate memory impairment at the one-time consultative evaluation with Dr. Vonderhaar. (Tr. 130). Dr. Malloy assessed plaintiff as able to perform

simple and repetitive work, with limited production standards, that requires no intense focus, is not quick-paced, and requires only superficial, brief, and infrequent contacts with coworkers and supervisors and no contact with general public. (Tr. 130-131) She opined that plaintiff would not respond well to close, over-the-shoulder supervision; he exhibits poor frustration tolerance; and he can maintain in a static environment where change is infrequent and support is available during times of change. (Tr. 131-32).

State agency reviewing psychologist Dr. Warren reviewed the file on reconsideration in December 2016 and found that plaintiff had mild restrictions in his activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence and pace. (Tr. 142) Dr. Warren affirmed Dr. Malloy's assessment on reconsideration. (Tr. 145-47).

### E. Specific Errors

On appeal, plaintiff presents three assignments of error: (1) the ALJ erred by failing to find that several of plaintiff's impairments were severe; (2) the ALJ erred by formulating an RFC that was not supported by substantial evidence because it was based on a factual error or misinterpretation of the record, i.e., the extent to which plaintiff cared for his grandchild; and (3) the ALJ erred by failing to properly weigh the treating physicians' opinions. (Docs. 12 and 18).

### 1. Severe impairment finding at step two of the sequential evaluation process

Plaintiff alleges that the ALJ erred at step two of the sequential evaluation process by failing to find that several of plaintiff's impairments are "severe" as that term is defined for disability purposes. The regulations define a "severe" impairment or combination of

18

impairments as one that significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions and the mental abilities to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. § 404.1521(b). An impairment is considered "severe" unless "the [claimant's] impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities." Soc. Sec. Ruling 85-28, 1985 WL 56856, at *3 (1985); *Winn v. Commr. of Soc. Sec.*, 615 F. App'x 315, 325 (6th Cir. 2015) (alterations in original). "The mere diagnosis of an impairment does not indicate the severity of the condition nor the limitations, if any, that it imposes." *Stevenson v. Astrue*, No. 3:10-cv-442, 2011 WL 7561883, at *5 (S.D. Ohio Aug. 1, 2011).

The claimant's burden of establishing a "severe" impairment at the second step of the disability determination process is "*de minimis*." *Winn*, 615 F. App'x at 325 (citing *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id*.

Once "an ALJ determines that one or more impairments is severe, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe." *Singleton v. Comm'r of Soc. Sec.*, 137 F. Supp. 3d 1028, 1033 (S.D. Ohio 2015) (quoting *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) (citing Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5 (July 2, 1996))) (internal quotation marks omitted). Where the ALJ finds at least

19

one severe impairment, the ALJ's failure to find additional "severe impairments" at step two may not constitute reversible error where the ALJ considers the claimant's impairments - both severe and non-severe - in the remaining steps of the disability determination. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Fisk*, 253 F. App'x at 583. "So long as the ALJ finds at least one severe impairment and analyzes all impairments in the following steps, the characterization of other impairments as severe or non-severe is 'legally irrelevant.'" *Deaner v. Commr. of Soc. Sec.*, No. 20-5113, 2020 WL 7490475, at *3 (6th Cir. Dec. 21, 2020) (citing *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008)). This rule takes into account the possibility that the ALJ "properly could consider [the] claimant's [non-severe impairments] in determining whether [the] claimant retained sufficient residual functional capacity to allow [him] to perform substantial gainful activity." *Winn*, 615 F. App'x at 326 (quoting *Maziarz*, 837 F.2d at 244).

The ALJ found that plaintiff has three "severe" impairments - fracture of the lower limb, affective disorder, and anxiety - that in combination "significantly interfere with the [plaintiff's] ability to engage in basic work activities." (Tr. 53). The ALJ found that though there was mention of other impairments in the record, the record did not show that these impairments were "severe." (*Id*.). Specifically, while plaintiff "alleged or was diagnosed with a disorder of the male genital organs," the ALJ noted that a diagnosis alone does not demonstrate that an impairment is "severe." (*Id*.). The ALJ found that "[w]hile there has been regular mention of hypogonadism and low testosterone, the evidence does not suggest that these conditions are functionally limiting." (Tr. 54; *see* Tr. 363, 366, 369, 372, 427, 546, 565, 574, 617, 715, 736,

739, 743, 761).  Plaintiff argues that the ALJ erred by failing to categorize his "hypogonadism, testosterone insufficiency, growth hormone deficiency, disorder of the pituitary gland, hypertension, [] traumatic brain injury with associated short term memory loss," and "personality disorder" as severe impairments.[9]  (Doc. 12 at PAGEID 836).

The ALJ erred by failing to find that plaintiff suffered from additional "severe" impairments that his treating physicians diagnosed as a pituitary gland abnormality, hypogonadism, hormone deficiencies, a TBI, and related mental health symptoms.[10]  The ALJ dismissed plaintiff's hypogonadism and testosterone deficiency as conditions that were simply alleged, diagnosed, or mentioned in the medical records.  The ALJ did not acknowledge at step two that throughout the period of alleged disability, plaintiff received regular treatment for these impairments from four physicians: his primary care physician, Dr. Sawyer, two specialists whom plaintiff was referred to: Dr. Lawley, a urologist, and Dr. Pretorius, a neuroendocrinologist; and Dr. Angel, a primary care physician in Dr. Pretorius' office.  The ALJ also failed to acknowledge at step two that plaintiff's treating physicians documented, and treated plaintiff for, debilitating

---

[9] Although plaintiff also alleges that the ALJ erred by failing to find his hypertension is a "severe" impairment (Doc. 12 at PAGEID 836), plaintiff has not pointed to any evidence in the record to show that his hypertension imposes functional limitations.

[10] Plaintiff's treating physicians diagnosed him with several related impairments.  Dr. Sawyer diagnosed severe chronic anxiety, chronic depression, insomnia and fatigue, low testosterone, and social phobia.  (Tr. 468, 472, 476, 487, 501, 526, 587, 612).  Dr. Lawley diagnosed "low testosterone due to hypogonadism, which is due to a pituitary injury that he sustained many years ago."  (Tr. 714).  Dr. Pretorius diagnosed a history of TBI; major depressive disorder with suicidal thoughts but no plan (for which plaintiff had tried multiple antidepressants without success); male hypogonadism for which he was receiving testosterone treatments; and short-term memory loss shown by "Brain SPECT [scan] consistent with near normal aging superimposed on effects of prior TBI with left temporal hypoperfusion and bilateral parieto-occipital hypoperfusion. . . ."  (Tr. 616).  Dr. Angel assessed a disorder of the pituitary gland, male hypogonadism, growth hormone deficiency, TBI, short term memory loss, and insomnia. (*See e.g.,* Tr. 717-18, 727, 728, 780).

symptoms that are consistent with plaintiff's diagnoses and that the treating physicians attributed to plaintiff's pituitary gland abnormality and hormone deficiencies.[11]

The treating physicians' notes, test results, and assessments show that plaintiff's diagnosed conditions, including a pituitary gland abnormality, hypogonadism, hormone deficiencies, and TBI, caused symptoms that persisted despite treatment with medication, and which had more than a minimal impact on plaintiff's functioning. Dr. Sawyer treated plaintiff for hypogonadism and his mental health symptoms throughout the period of alleged disability. Testosterone treatments improved plaintiff's mood initially and "invigorated" him, but by July of 2016 the treatments appeared to be having no effect. (Tr. 511). Dr. Pretorius opined in May 2017 that based on plaintiff's "low levels of the pituitary hormones," plaintiff might have "other pituitary abnormalities that would also compromise [his] function." (Tr. 712). Dr. Pretorius started plaintiff on growth hormone treatment to help improve "decreased mental function, such as memory loss"; however, plaintiff had "little or no improvement in his memory." (Tr. 712). Dr. Pretorius adjusted plaintiff's medications by adding Omnitrope, a prescription medicine that contains human growth hormone[12], and Donepezil, a drug that "is used to treat dementia . . . in people who have Alzheimer's disease. . . ."[13] (Tr. 615, 617). Dr. Pretorius recommended that

---

[11] Social Security Ruling 14-3P, 2014 WL 2472009 (June 2, 2104), advises that endocrine gland disorders, including abnormalities of the pituitary gland ("the master gland" which "controls the function of [nearly] all other endocrine glands") and hypogonadism, with resulting hormonal imbalances, "can cause an endocrine disorder, resulting in complications affecting various parts of the body," including "learning problems and emotional changes under the mental disorders listings (12.00)" in the case of male hypogonadism.

[12] https://www.omnitrope.com/ (last accessed March 29, 2021).

[13] https://medlineplus.gov/druginfo/meds/a697032.html (last accessed March 29, 2021).

plaintiff continue to pursue authorization for higher growth hormone therapy in the hope this would "also help [plaintiff's] memory."  (Tr. 618).  Dr. Pretorius tied plaintiff's hypogonadism to "multiple TBI experiences over many years" (Tr. 615), and a SPECT brain scan disclosed hypoperfusion, or "decreased blood flow."[14]  (Tr. 618).

In November 2017, Dr. Pretorius diagnosed a "mild cognitive impairment," which he explained meant "an abnormal memory compared to normal but not so severe as to be considered demented," based on MoCA test results.  (Tr. 712).   Dr. Pretorius opined that due to his short-term memory loss as reflected by the test results, plaintiff would not be able to remember even simple instructions; he would have "great difficulty" learning "even relatively simple" new procedures; and he "would forget the names of coworkers or clients involved in any business endeavor."  (Tr. 712-13).  Dr. Pretorius opined in August 2018 that this short-term memory deficit would cause plaintiff to be off task "for much more than 15% of the time in any task-oriented environment."  (Tr. 774).  Dr. Pretorius opined in a letter dated August 31, 2018, that multiple MoCA tests administered to plaintiff over the course of six months had yielded scores that were "quite consistent and correlate well with the patient's performance status of mild to moderate cognitive impairment."  (Tr. 785).  The results led Dr. Pretorius to conclude that plaintiff would be off task around 50% of the time.  (*Id*.).  Dr. Pretorius opined that plaintiff "consistently has difficulty with short-term memory" and that "the abnormality in the hippocampus, particularly when present bilaterally, is the cause of [plaintiff's] short-term memory loss."  (*Id*.).

---

[14] https://www.merriam-webster.com/medical/hypoperfusion.

Thus, the medical evidence amply documents plaintiff's pituitary gland abnormality, hypogonadism, hormone deficiencies, and TBI.  The medical evidence also thoroughly documents the mental functional limitations that plaintiff's treating neuroendocrinologist found were linked to these impairments, including short-term memory loss, irregular moods, impulsive behavior, and inability to concentrate.  In finding there was no evidence of functional limitations associated with a pituitary gland abnormality, hypogonadism, hormone deficiencies, and TBI, the ALJ appears to have ignored the link between these impairments and plaintiff's mental health symptoms that was documented by plaintiff's treating physicians.  The medical evidence discussed above shows that these impairments impose more than minimal functional limitations. The ALJ's finding that "the evidence does not suggest that [hypogonadism and low testosterone] are functionally limiting" and therefore are not "severe," and the ALJ's failure to consider plaintiff's pituitary gland abnormality and TBI at step two, was error.  (Tr. 54).

The ALJ also erred by failing to find that plaintiff suffers from a "'severe' personality disorder."  (Doc. 12 at PAGEID 836).  Plaintiff alleges that the records and reports from Dr. Sawyer document that he suffered from this severe impairment in addition to severe depression and anxiety.  (*Id*.).  Dr. Sawyer diagnosed plaintiff with a social phobia and a personality disorder, in addition to severe anxiety and depression, in July 2016.  (Tr. 490).  In October 2016, Dr. Sawyer opined that plaintiff's impairments met Listing 12.08 for Personality Disorders.  (Tr. 520).  Dr. Sawyer opined that plaintiff's condition was characterized by "[d]eeply ingrained, maladaptive patterns of behavior associated with" symptoms of "[s]eclusiveness" and "[p]ersistent disturbances of mood or affect (depression)" which resulted in "[m]arked

difficulties in maintaining social functioning" and "[m]arked difficulties in maintaining

concentration, persistence, or pace. . . ." (Tr. 520). The treatment notes show that plaintiff's

head trauma can and has negatively impacted his personality (Tr. 511, 524); he was unable to

maintain healthy relationships with his sons (Tr. 610); and his marriage was troubled because his

wife took care of everything (Tr. 606-08). Further, Dr. Vonderhaar opined that plaintiff would

not be able to get along well with others in an amiable or congenial manner; that he would have

difficulty working effectively and efficiently with others; and that he would not be able to

withstand the stress and pressures associated with day-to-day work activities. (Tr. 498). Despite

the medical evidence documenting plaintiff's personality disorder and the severity of his

symptoms, the ALJ did not address plaintiff's personality disorder at step two of the sequential

evaluation process. This was error.

Defendant argues that the ALJ nonetheless did not commit reversible error at step two

because he considered all of plaintiff's impairments, including the impairments the ALJ found

were not "severe," at the remaining steps of the sequential evaluation process. (Doc. 17 at

PAGEID 865-66). The Court disagrees and finds that the ALJ's error in categorizing plaintiff's

impairments was not harmless.

First, the ALJ ignored medical evidence related to the impairments he found were not

"severe" at the Listing stage of the sequential evaluation process. The ALJ failed to consider Dr.

Sawyer's opinion that plaintiff met Listing 12.08 for personality disorders at step three. (Tr.

520). The ALJ erroneously found that "[n]o treating physician has indicated that the claimant

has an impairment equivalent in severity to the criteria of any listed impairment in the Listing of

Impairments" without addressing Dr. Sawyer's opinion. (Tr. 54). Further, as discussed in connection with the second assignment of error, the ALJ improperly relied on evidence that lacked sufficient context and detail to conclude that plaintiff has a stable temperament. (Tr. 55). Thus, the ALJ's failure to characterize plaintiff's personality disorder as "severe" was not harmless error.

Further, the ALJ did not take plaintiff's pituitary gland abnormality, hypogonadism, or hormone deficiencies into account when formulating the RFC. The ALJ made no mention of these conditions when evaluating plaintiff's subjective complaints and weighing the medical opinion evidence. (Tr. 57-60). The ALJ did not acknowledge a link that plaintiff's treating physicians had made between plaintiff's pituitary gland abnormality, hypogonadism, and hormone deficiencies and his mental health symptoms. Instead, the ALJ discounted the opinions of plaintiff's treating physicians related to plaintiff mental health symptoms and limitations, even though the treating physicians diagnosed and treated the medical conditions that caused those symptoms. (Tr. 58-60). The ALJ improperly found that plaintiff's mental health was outside their area of expertise. (*See* Tr. 58 - "[W]hile Drs. Sawyer, Pretorius, and Angel all found debilitating deficiencies in the ability to remember, concentrate, and interact, these treating providers are primary care physicians and endocrinologists," not mental health specialists.). By rejecting the treating physicians' assessment of debilitating mental limitations on this ground, the ALJ failed to account for "severe" impairments diagnosed by plaintiff's treating physicians and the resulting mental limitations these treating physicians assessed.

The ALJ found multiple "severe" impairments, but he did not properly consider *all*

26

impairments he categorized as non-severe and account for the limitations from those impairments at the later steps of the sequential evaluation process. The ALJ's failure to find that impairments assessed by plaintiff's treating physicians were not "severe" impairments at step two of the sequential evaluation process was not harmless error. Plaintiff's first assignment of error is sustained.

### 2. The ALJ's mischaracterization of the evidence at step four of the sequential evaluation process.

Plaintiff argues as his second assignment of error that the ALJ erred at step four by mischaracterizing, and improperly relying on, evidence related to plaintiff caring for his grandson to discount the debilitating impact of plaintiff's impairments.[15] The evidence in question is a notation included in a treatment note that Dr. Sawyer prepared in November 2016. Dr. Sawyer noted:

> [Plaintiff] knows he has an upper respiratory infection. He was taking care of the grandbaby. It is quite a responsibility. His wife is now going through it as well. It is dragging her down because of what is going on with the children. He is tired.

---

[15] In support of his argument, plaintiff references affidavits from his wife and his son that he submitted to the Appeals Council for its consideration after the ALJ's decision. (Doc. 12 at PAGEID 840). The Court cannot consider this "new" evidence in deciding plaintiff's appeal under sentence four of 42 U.S.C. § 405(g). *See Cline v. Commr. of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (citing *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993)). The Court can only decide whether in light of the "new" evidence, this matter should be remanded under sentence six of § 405(g) for further administrative proceedings. A remand under sentence six is warranted only if plaintiff shows "that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Id*. (citing *Cotton*, 2 F.3d at 696). Plaintiff has clarified in his reply brief that he does not seek a remand under sentence six for consideration of this evidence that was not before the ALJ. (Doc. 18 at PAGEID 892). Therefore, the Court cannot consider the affidavits.

(Tr. 524). Plaintiff's care of his grandchild is not mentioned elsewhere in the medical evidence, and there was no testimony about the matter at the ALJ hearing. Yet, Dr. Sawyer's notation factored heavily into the ALJ's decision.

First, Dr. Sawyer's notation factored into several of the ALJ's findings at step three of the sequential evaluation process. (Tr. 55). The ALJ found that plaintiff's ability to care for his grandson, and the trust in plaintiff's mental stability that plaintiff's son apparently showed by placing his son in plaintiff's care, evidenced a lack of debilitating mental limitations in three areas of functioning. First, the ALJ found:

> [W]hile Dr. Pret[o]rius essentially found the claimant disabled based on memory deficits, he also stated that testing results fell in the mild deficit range (Exhibit 12F). Also Dr. Vonderhaar observed adequate memory (Exhibit 5F). In addition, while the claimant reported deficiencies in the ability to follow instructions, *considering the fact that he was able to care for his grandchild, which he conceded was a big responsibility*, the evidence supports no more than a moderate functional restriction in the ability to understand or apply information.

(*Id*.) (emphasis added). Second, the ALJ found that:

> As for interacting with others, while the claimant alleged an inability to interact with others, aside from his wife, and he gets in fights with other family members, including his sons, the fact is, he has been married for 25 years, his sons moved back home in 2017, *and one of them apparently trusts his temperament to be stable enough to leave a child in his care*.

(*Id*.) (emphasis added). Third, the ALJ found:

> With regard to the ability to concentrate, persist or maintain pace, despite Dr. Angel's finding of the need for 90% of the workday off task, *the claimant has only moderate difficulties based on his admitted ability to care for a grandchild*. Also, he conceded the ability to watch television and manage a savings account.

(*Id*.) (emphasis added). The ALJ concluded:

28

> From a mental perspective alone, *and considering his ability to care for his grandchild*, the overall evidence does not support more than a mild restriction in his ability to adapt on a day-to-day basis.

(*Id*.) (emphasis added).

In addition, Dr. Sawyer's notation factored into the ALJ's RFC finding at step four of the sequential evaluation process. When evaluating plaintiff's subjective complaints, the ALJ noted he was "struck by the fact that there are no psychiatric hospitalizations, treatment consisted only of medication management, the claimant was able to maintain a 25 year marriage, and *his son trusted his mental status enough to permit the claimant to care for his own son*." (Tr. 58) (emphasis added). Further, the ALJ gave the nonexamining psychologists' assessments only "some weight" because he found the assessments were inconsistent with evidence showing while plaintiff "has disagreements with his adult children[,] they have moved back home and *one even trusts the claimant to care for his grandchild*." (Tr. 59) (emphasis added). The ALJ also gave Dr. Angel's assessment "little weight," in part because "if the claimant's mental symptomatology was so significant, *he would never be trusted to watch his grandson*." (Tr. 60) (emphasis added). The ALJ concluded:

> In sum, the [] residual functional capacity assessment is supported by Dr. Sawyer's findings of non-specific range of motion limitations in the lower extremity, the serial findings of no gait deficits, Dr. Pret[or]ius' serial findings of no orthopedic abnormalities, the lack of any treatment for the leg condition other than ice and elevation, the clinical findings by Dr. Vonderhaar, the claimant's long-term, supportive marriage, *the fact that he was permitted to watch his grandchild*, treatment limited to medication management, and the lack of psychotherapy or psychiatric hospitalization.

(Tr. 60) (emphasis added).

29

Thus, the ALJ relied very heavily on Dr. Sawyer's ambiguous notation that plaintiff "was taking care of the grandbaby," which was "quite a responsibility." The ALJ's repeated reliance on Dr. Sawyer's vague notation was error. "[T]he ALJ has an inquisitorial duty to seek clarification on material facts." *Wright-Hines v. Comm'r of Soc. Sec.,* 597 F.3d 392, 396 (6th Cir. 2010). This duty includes fully and fairly and fully developing the record "through a conscientious probing of all the relevant facts." *Thrasher v. Comm'r of Soc. Sec*., No. 1:12-cv-151, 2013 WL 486123, at *4 (S.D. Ohio Feb. 6, 2013), *report and recommendation adopted*, 2013 WL 791882 (S.D. Ohio Mar. 4, 2013) (citation omitted).

Here, the ALJ did not note any additional facts that clarify Dr. Sawyer's notation and show how it was relevant to the assessment of plaintiff's mental limitations. There is no indication in Dr. Sawyer's treatment note regarding the age of the "grandbaby" that plaintiff was taking care of; how long plaintiff had been taking care of the grandchild and whether it was a short-term arrangement or a short-term situation; what responsibilities "taking care" of the grandchild entailed; whether plaintiff shared the caregiving responsibilities with his wife; and whether plaintiff successfully handled the responsibilities from a mental health perspective. Further, there is no information in the record as to why plaintiff was taking care of the grandchild, such as whether it was an emergency arrangement and no other option was available or whether it was an arrangement that plaintiff's son chose as the best option.

Rather than attempt to develop the record to include any information about plaintiff's caregiving duties and how plaintiff's performance of those duties reflected on his mental functioning, the ALJ drew several unsupported inferences about plaintiff's mental health from

30

Dr. Sawyer's cryptic and isolated notation. The ALJ inferred that plaintiff's son had options as to who would care for his child and chose plaintiff as the caregiver because plaintiff's son "trusted" his father's mental health was sufficiently sound. The ALJ inferred that plaintiff's son's judgment concerning his father's mental health was reliable. The ALJ inferred that the mental abilities required to care for plaintiff's grandchild were inconsistent with plaintiff's allegedly debilitating mental limitations. And the ALJ inferred that plaintiff successfully cared for, and mentally coped with caring for, the grandchild. These inferences are not supported by the record. The record shows only that plaintiff cared for his grandchild in some capacity for some unspecified period of time, which says nothing about plaintiff's mental functioning and does not support a finding that plaintiff's mental symptoms were not debilitating.

Further, the ALJ relied on Dr. Sawyer's notation to the exclusion of other medical evidence that supports plaintiff's claims of debilitating mental limitations. This evidence includes the remainder of the November 2016 treatment note in which Dr. Sawyer noted that plaintiff was "taking care" of his grandchild. (Tr. 524). Dr. Sawyer also noted on that date that plaintiff was having "a hard time sleeping and concentrating"; he was "worse now"; he was on a "downward spiral"; his concentration was "much worse"; and he was becoming "much more secluded and a little bit irrational at times." (*Id*.). Dr. Sawyer reported that plaintiff was "a little irritable and tremulous." (*Id*.). Several months earlier, in July 2016, Dr. Sawyer described plaintiff's mental status abnormalities as "severe anxiety and depression"; "difficulty working with others"; "difficulty concentrating and following through on tasks"; depression and severe anxiety due to "frustration and difficulty concentrating"; and a "very volatile personality" that

31

caused plaintiff to "react[] to certain environments unless medicated." (Tr. 489). Dr. Sawyer found that plaintiff had several "stress issues with family members that has (sic) exacerbated his condition of anxiety and getting along with others." (*Id.*). After plaintiff was referred to Dr. Pretorius, testing disclosed a short-term memory deficit; a SPECT brain scan revealed a brain injury that causes "the tendency to unstable mood," which are "sudden changes" in mood "from normal or happy to sad or angry," accompanied by "impulsive behaviors"; and Dr. Pretorius opined that plaintiff would be off task 15% to 50% of the workday. (Tr. 712-13, 774, 785). Dr. Vonderhaar opined in August 2016 that plaintiff's mental ability to relate to others was negatively influenced by depression and social isolation and "not being able to get along well with others in an amiable or congenial manner"; his ability to maintain attention and concentration, persistence, and pace to perform routine tasks may at times be negatively influenced by depression and anxiety; and he would have difficulty withstanding the stress and pressures of day-to-day work activities. (Tr. 498). Viewed in the context of this evidence and the record as a whole, the ALJ did not reasonably rely on Dr. Sawyer's ambiguous notation that plaintiff was "taking care" of his grandchild to discount the severity of plaintiff's mental limitations.

Plaintiff's second assignment of error is sustained.

### 3. Weight to the treating physicians

Plaintiff argues that the ALJ erred by not giving "controlling weight" to the opinions of (1) Dr. Sawyer, his treating primary care physician; (2) Dr. Pretorius, his treating

neuroendocrinologist; and (3) Dr. Angel, his primary care physician in Dr. Pretorius' office. (Doc. 12 at PAGEID 845-849).

Under the treating physician rule, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. . . ." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007). The rationale for the rule is that treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." *Id.* A treating source's medical opinion must be given "controlling weight" if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).

If a treating source's medical opinion is not entitled to controlling weight, the ALJ must apply the regulatory factors set out in § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *Gayheart*, 710 F.3d at 376; *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 408 (6th Cir. 2009) ("Treating source medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of the factors provided in" 20 C.F.R. § 404.1527(c)) (quoting SSR 96-2p, 1996 WL 374188, at *4)[16]. These factors include the length

---

[16] SSR 96-2p was rescinded effective March 27, 2017, when the Social Security Administration published final rules that revised the rules and regulations applicable to the evaluation of medical evidence for claims filed on or after that date. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5844-45, 5869, 5880. Since plaintiff's claim was filed in 2016, SSR 96-2p applies to this case. *See Shields v. Comm'r of Soc. Sec.*, 732 F. App'x 430, 437 n.9 (6th Cir. 2018).

of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson,* 378 F.3d at 544. *See also Blakley*, 581 F.3d at 408. The ALJ must "give good reasons" in his written decision for the weight given to a treating source's medical opinion. 20 C.F.R. § 404.1527(c)(2). The ALJ's reasons must be supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the ALJ gave to the treating source's medical opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376 (citing SSR 96-2p, 1996 WL 374188, at *5). This requirement serves a two-fold purpose: (1) it helps a claimant to understand the disposition of his case, especially "where a claimant knows that his physician has deemed him disabled," and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule." *Wilson*, 378 F.3d at 544.

Dr. Sawyer treated plaintiff from 2001 through 2017 for depression, anxiety, insomnia, and social phobia, "with worsening [symptoms]" in the five years preceding July 2016. (Tr. 472, 487). The ALJ noted that Dr. Sawyer diagnosed plaintiff with severe depression and anxiety, and he "reported that [plaintiff's] conditions were also consistent with borderline personality disorder." (Tr. 57). The ALJ also noted that according to Dr. Sawyer, plaintiff has not been able to obtain successful employment since 2001; in July 2016, Dr. Sawyer diagnosed plaintiff with severe anxiety, social phobia, and depression with personality disorder and opined that plaintiff could not work with others due to his social phobia and personality disorder (Tr. 486-90); and in

October 2016, Dr. Sawyer opined that plaintiff had marked limitations in social functioning and maintaining concentration, persistence, and pace (Tr. 786-93; *see also* Tr. 513-20).[17] (Tr. 58).

The ALJ gave "little weight" to Dr. Sawyer's mental health opinions. (Tr. 58). The ALJ found his opinions were "not supported by the overall record" because first, they were not consistent with the findings of the consultative and nonexamining psychologists. (Tr. 58-59). The ALJ found that whereas plaintiff's "primary care physician prescribed Xanax and repeatedly noted [plaintiff's] subjectively reported symptomatology [Tr. 505-11, 524-25, 588-612]," Dr. Vonderhaar and the state agency reviewing psychologists found "no support for marked functional restrictions." (*Id.*). Second, plaintiff had "no psychiatric presentations to the emergency room or hospitalizations." (Tr. 59). Third, the ALJ found that Dr. Sawyer's opinions were internally inconsistent because he "repeatedly noted that [plaintiff's] conditions persisted back to 2001, but since the alleged onset, he released [plaintiff] to return to work on three separate occasions." (*Id.*).

The ALJ's decision to give Dr. Sawyer's medical opinions less than "controlling weight" is not substantially supported. Although Dr. Sawyer had treated plaintiff for over 15 years, the ALJ relied on one alleged inconsistency in Dr. Sawyer's extensive records - three releases he signed for plaintiff to return to work - to find that Dr. Sawyer's opinions were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques." (Tr. 59). These work releases are not sufficient, standing alone, to demonstrate that Dr. Sawyer's opinions were inconsistent with his findings. Two of the work releases the ALJ apparently referenced are

---

[17] This is the only mention the ALJ makes of Dr. Sawyer's opinion that plaintiff met the Listing for three mental impairments.

dated December 2004 and June 2011, respectively, and therefore predate the alleged disability

onset date of July 27, 2011.  (Tr. 448, 457).  The third work release is dated October 29, 2012,

which is slightly more than one year after plaintiff last worked.  (Tr. 448).  Dr. Sawyer reported

in July 2016 that plaintiff had experienced anxiety and depression during the preceding 15 years,

but his conditions had worsened during the past five years after plaintiff was fired from his job in

July 2011.  (Tr. 487).  It is not clear why the ALJ found the October 2012 work release to be

inconsistent with Dr. Sawyer's medical opinions in light of that finding.  Further, to the extent

the work release from October 2012 is inconsistent with Dr. Sawyer's medical opinions, the ALJ

did not point to any other evidence, and particularly any "clinical or laboratory evidence[,] that

contradicts [Dr. Sawyer's] analysis" and opinions of debilitating mental limitations.  *See Shields,*

732 F. App'x at 439 (finding error where the ALJ pointed to no clinical or laboratory evidence

that contradicts the treating doctor's analysis.).  Thus, the ALJ erred by finding the first prong of

the "controlling weight" standard, 20 C.F.R. § 404.1527(c)(2), was not met.

Further, the ALJ did not cite any specific objective evidence to show that Dr. Sawyer's

opinions were "inconsistent with the other substantial evidence in [the] case record."  20 C.F.R.

§ 404.1527(c)(2).  The ALJ indicated that unspecified "clinical findings" made by Dr.

Vonderhaar do not support the restrictions Dr. Sawyer assessed, and the nonexamining

psychologists reached different conclusions than Dr. Sawyer based on their review of the record.

(Tr. 58-59).  But the ALJ "neither identifie[d] the 'objective clinical findings' at issue nor

discusse[d] their inconsistency with [the treating physician's] opinion."  *See Shields*, 732 F.

App'x at 439.  "[I]t is not enough to dismiss a treating physician's opinion as 'incompatible'

36

with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010). The "conflicting substantial evidence [that is purportedly inconsistent with the treating physician's opinion] must consist of more than the medical opinions of the nontreating and nonexamining doctors." *Gayheart*, 710 F.3d at 377. As the Sixth Circuit explained in *Gayheart*:

> Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id.* Nor did the ALJ consider whether Dr. Sawyer's findings and opinions were consistent with those of plaintiff's other treating providers and their clinical findings and test results. The ALJ failed to provide an explanation regarding his controlling weight analysis of Dr. Sawyer's opinions, which "'hinders a meaningful review of whether the ALJ properly applied the treating-physician rule. . . .'" *McGeorge v. Comm'r of Soc. Sec.*, 309 F. Supp. 3d 514, 519 (S.D. Ohio 2018) (citing *Gayheart*, 710 F.3d at 377) (citations omitted).

The only implicit justification the ALJ provided for not giving controlling weight to Dr. Sawyer's findings is Dr. Sawyer's area of practice, which is primary care. This was not a proper factor to consider at the controlling weight stage of the analysis, but instead it is a factor "properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight." *Id.* at 520 (quoting *Gayheart*, 710 F.3d at 376). Primary care physicians "identify and treat the majority of Americans' psychiatric disorders" and are therefore

able to provide opinions on mental impairments. *Id*. (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (internal quotation marks omitted)). Thus, the ALJ erred by declining to give Dr. Sawyer's opinions on plaintiff's mental status controlling weight on the ground Dr. Sawyer is not a psychiatrist or psychologist. *Id*. (citing *Wert v. Comm'r of Soc. Sec.*, 166 F. Supp. 3d 935, 946 (S.D. Ohio 2016); *Byrd v. Comm'r of Soc. Sec.*, No. 3:14-cv-242, 2015 WL 4540575, at *5 (S.D. Ohio May 29, 2015); *King v. Comm'r of Soc. Sec.*, No. 3:14-cv–351, 2016 WL 1729550, at *6 (S.D. Ohio Mar. 28, 2016)).

Even assuming Dr. Sawyer's opinions were entitled to less than controlling weight, the ALJ erred by failing to give "good reasons" for the "little weight" he afforded Dr. Sawyer's opinions. (*See* Tr. 58). The ALJ did not properly consider the length of the treatment relationship, the frequency of plaintiff's examinations, and the nature and extent of the treatment relationship. *See Wilson,* 378 F.3d at 544. *See also Wert*, 166 F. Supp. 3d at 946 (finding the ALJ erred by failing to consider "the considerable length of the treatment relationship," a factor that weighs "in favor of according [the treating physician's] opinion deferential, if not controlling, weight," and by not considering how the treating physician "could provide the 'detailed, longitudinal picture of [plaintiff's] medical impairment[,]' as contemplated by the regulations."). The ALJ did not consider that Dr. Sawyer had seen plaintiff on a regular basis over the course of approximately 15 years; instead, the ALJ implicitly and improperly rejected Dr. Sawyer's opinion because he is not a psychologist. The ALJ did not explain why Dr. Sawyer's opinions should be discounted on this ground given his extensive treatment relationship with plaintiff and the consistent care and treatment he provided for plaintiff's mental

impairments. *See McGeorge*, 309 F. Supp. 3d at 519. Further, for the reasons discussed *supra*, the ALJ did not give "good reasons" for finding Dr. Sawyer's opinions were not supported by his own clinical and other findings and were not consistent with the record as a whole. The ALJ discounted Dr. Sawyer's opinions because plaintiff had not presented to the emergency room or been hospitalized for his mental impairments, but the ALJ did not consider that Dr. Sawyer had consistently treated plaintiff with several different medications, plaintiff had been referred to two specialists for treatment, and the treating neuroendocrinologist had also provided extensive treatment, performed testing, and made findings that supported Dr. Sawyer's opinions.

Thus, the ALJ did not give "good reasons" that are substantially supported by the evidence for declining to give "controlling weight" to the opinions of plaintiff's treating physician, Dr. Sawyer, and for giving his opinions only "little weight."

The ALJ also gave "little weight" to treating specialist Dr. Pretorius' opinions that: plaintiff would find it difficult, if not impossible, to pursue gainful employment because plaintiff would not be able to remember even simple instructions, he would have "great difficulty" learning new procedures, and he would forget the names of co-workers and clients (Tr. 712-13); plaintiff would likely miss 2 or more days of work each month and would be off task more than 15% of the work day (Tr. 774); and plaintiff would be off task approximately 50% of the work day due to short-term memory loss (Tr. 785). (Tr. 59). The ALJ found that though Dr. Pretorius' findings were "purportedly based on objective testing," they were entitled to "little weight" because (1) Dr. Pretorius is an "endocrinologist and not a mental health specialist"; (2) plaintiff does not have a history of mental health treatment except for "conservative medication

management prescribed by a primary care physician," with no emergency room visits or hospitalizations; (3) Dr. Vonderhaar found "adequate memory," and Dr. Pretorius concluded testing disclosed only "mild deficits" (Tr. 712-13); (4) Dr. Pretorius concluded plaintiff's memory deficits were likely caused by a "history of concussions," but an MRI he ordered was "unremarkable" and his recommendation that further testing be performed suggested he was not confident in his conclusions; (5) Dr. Pretorius concluded that plaintiff would be unable to get along with others based on plaintiff's report that he was fired for this reason, but the record suggests plaintiff was fired for missing too many days of work; and (6) Dr. Pretorius initially found plaintiff would be off task 15% of the time but later increased the percentage to 50% of the time, even though nothing suggested plaintiff's symptoms had worsened. (Tr. 59-60).

The ALJ did not give good reasons for declining to give Dr. Pretorius' opinions controlling weight. First, the ALJ did not point to substantial clinical or laboratory evidence that contradicts Dr. Pretorius' findings. The ALJ noted an alleged discrepancy in Dr. Pretorius' findings as to the percentage of time plaintiff would be off task due to his cognitive or memory impairment. (Tr. 60; see Tr. 774, 785). Dr. Pretorius noted a "significant short-term memory deficit" in a letter date-stamped August 1, 2018, and he opined that plaintiff would be "'off task' for *more than* 15% of the time." (Tr. 774) (emphasis added). In a letter dated August 31, 2018, Dr. Pretorius opined that plaintiff had a "mild to moderate cognitive impairment" and would be off task "about 50% of the time." (Tr. 785). Dr. Pretorius provided these assessments one month apart, and it appears that plaintiff was administered an additional MoCA test in the

interim. (Tr. 774, 785). Thus, the ALJ did not reasonably rely on a discrepancy in the percentages to discount Dr. Pretorius' opinion.

The ALJ dismissed Dr. Pretorius' findings as to plaintiff's memory deficits based on (1) testing that showed only "mild deficits" (Tr. 712-13), and (2) "unremarkable" MRI results and Dr. Pretorius' recommendation for further testing. (Tr. 60). In both instances, the ALJ impermissibly "interpret[ed] raw medical data in functional terms" to show inconsistencies that are not supported by the medical evidence. *See Isaacs v. Astrue*, No. 1:08-cv-00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (citation and internal quotation marks omitted). Dr. Pretorius defined a "mild" cognitive deficit as "meaning an abnormal memory compared to normal but not so severe as to be considered demented." (Tr. 712). After considerable additional testing, Dr. Pretorius opined that plaintiff's scores were "quite consistent" with a "mild to moderate cognitive impairment." (Tr. 785). Dr. Pretorius opined how plaintiff's cognitive impairments would impact his mental functioning. The ALJ did not point to any evidence in the record that contradicted Dr. Pretorius' interpretation of the test data. The ALJ relied only on Dr. Vonderhaar's finding that plaintiff had "adequate memory," which Dr. Vonderhaar made after examining plaintiff one time, to discount Dr. Pretorius' assessment of the test results and plaintiff's memory impairment. (Tr. 60). However, the ALJ did not explain why the opinion of the one-time examining psychologist regarding plaintiff's memory deficits was more reliable than the opinions of plaintiff's neuroendocrinologist, who performed repeated testing over an extended time period.

The ALJ also impermissibly relied on "unremarkable" MRI results to discount Dr. Pretorius' opinions as to the causes of plaintiff's memory deficits. (Tr. 60). Dr. Pretorius opined that a pituitary adenoma was "[p]ossible but not seen on MRI Nov[.] 2017." (Tr. 716). He diagnosed plaintiff with a disorder of the pituitary gland "[l]ikely secondary to TBI including hypogonadism." (*Id*.). Dr. Pretorius later opined that while the MRI "was normal and showed no pituitary adenoma, it is more likely that the abnormal pituitary function has another cause" in plaintiff's case. (Tr. 773). Contrary to the ALJ's interpretation of the evidence, Dr. Pretorius did not opine that the MRI results ruled out a history of prior concussions or head trauma, or that a normal MRI called into question any of his conclusions as to the cause of plaintiff's memory impairment. By apparently discounting Dr. Pretorius' opinion for these reasons based on the normal MRI, the ALJ erroneously substituted his interpretation of the MRI results for Dr. Pretorius' medical judgment.

Additionally, the ALJ did not explain how Dr. Pretorius' findings are inconsistent with the overall record. The ALJ did not consider whether the debilitating mental limitations Dr. Pretorius assessed were consistent with the limitations found by Dr. Sawyer, plaintiff's long-time primary care physician, and Dr. Angel, the primary care physician in Dr. Pretorius' office. Although each of these physicians found debilitating mental limitations, the ALJ focused on Dr. Pretorius' lack of specialization in the mental health field and rejected his findings because they were inconsistent with unspecified findings made by nontreating mental health specialists of record. For the reasons discussed above, this was improper. *See McGeorge*, 309 F. Supp. 3d at 520; *Gayheart*, 710 F.3d at 377.

42

Assuming, *arguendo*, that the ALJ was entitled to give Dr. Pretorius' opinion less than "controlling weight," the ALJ did not give "good reasons" for affording his opinion "little weight." The ALJ did not consider the length of the treatment relationship and the frequency of examination, the nature and extent of plaintiff's treatment relationship with Dr. Pretorius, the consistency of Dr. Pretorius' opinion with the record as a whole, and the fact that plaintiff was referred to Dr. Pretorius for treatment of conditions that are within Dr. Pretorius' area of specialization. *Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527(c)(2). Dr. Pretorius saw plaintiff on a regular basis, he administered and interpreted cognitive function tests, and he analyzed brain scan results. The ALJ failed to take these factors into account. His decision to give Dr. Pretorius' medical opinions "little weight" is not substantially supported.

Finally, plaintiff contends the ALJ erred when he gave "little weight" to the opinion of treating physician Dr. Angel that based on the results of a CNS Vital Signs test, plaintiff would have "a significant impairment with focus, attention, and concentration deficits, and would be off task 90% of a work period [Tr. 779-82]." Plaintiff alleges that the ALJ's consideration of Dr. Angel's opinion "was legally insufficient." (Doc. 12 at PAGEID 847). Plaintiff fails to explain specifically how the ALJ erred in his consideration of Dr. Angel's opinion. Plaintiff also fails to acknowledge that Dr. Pretorius reported that the CNS Vital Signs test results were invalid. (Tr. 785). The Court finds no error in the ALJ's weighing of Dr. Angel's opinion.

**III.  This matter will be reversed and remanded for further proceedings**

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for

rehearing or to reverse and order an award of benefits.  Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan,* 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Secretary of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). Remand for payment of benefits is warranted only "where proof of the disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Id*.

This matter will be reversed and remanded pursuant to sentence four of § 405(g) for further proceedings consistent with this Order.  All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of his alleged onset date.  *See Faucher,* 17 F.3d at 176.  On remand, the ALJ should elicit further medical and vocational evidence as warranted; reevaluate the evidence and reconsider his "severe" impairment finding at step two; and reweigh the medical opinion evidence.

**IT IS THEREFORE ORDERED THAT**:

The decision of the Commissioner is **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date:  3/31/2021

Karen L. Litkovitz
United States Magistrate Judge